# Thomas v. State.

### Indictment for Robbery.

1. *Organization of petit jury for trial of capital case in the City Court of Montgomery.*—Under section 10 of the act approved March 2, 1901, "to more effectually secure competent and well qualified jurors in the county of Montgomery" (Acts of 1900-1901, p. 1994) where, in the drawing and empannelling of a jury for the trial of a capital case some of the jurors, whose names are drawn for the trial of such case were serving upon a jury which was out considering a verdict in another case, and the names of such jurors when drawn are laid aside, if, after exhausting the list of names drawn and summoned for the trial of such case the jury is still incomplete, and those jurors whose names had been drawn and laid aside had returned into court with a verdict, and were, therefore, ready to serve as jurors in

[Thomas v. State.]

said pending case, and before an order is made for the drawing and summoning of talesmen, it is not error for the court to require the names of said jurors, which had been so laid aside, to be put again into the hat, and for the drawing of the jury to proceed; and if from these jurors the jury in the case is completed, the defendant obtains a jury to try his case from the special venire drawn and summoned for the trial of his case, and has no ground for complaint.

2. *Robbery; when no duress shown; sufficiency of evidence.*— On a trial under an indictment for robbery, it was shown by the evidence that the defendant went to the place where the robbery was committed, in company with one J., and said J. drew his pistol and caused the persons present at such place to hold up their hands and then requested or commanded the defendant to search them, while he, J. held the pistol drawn; that the defendant did as directed by J. and turned over all the money obtained by him from the search to said J.; that after the search J. left the scene and was soon joined by defendant, who was again seen with J. during the day. The evidence for the defendant was that J. "made him search the parties and do what he did," and that " the part he took in the affair was at the command of J. while he had a pistol in his hand, and that he got none of the money taken. *Held*: There was sufficient evidence from which the jury might have reasonably inferred the defendant's complicity in the robbery committed by J. and there was nothing to authorize the inference that defendant acted under duress of life or great bodily harm, and was, therefore, excusable. (TYSON and SHARPE, JJ., *dissenting*.)

APPEAL from the City Court of Montgomery.

Tried before the Hon. WILLIAM H. THOMAS.

The appellant in this case, Bill Thomas, was jointly indicted with one Bill Jenkins for robbery, was convicted and sentenced to the penitentiary for ten years.

The bill of exceptions contains the following recitals as to the organization of the jury for the trial of the defendant: "When at the commencement of the trial of this case, the sheriff began to draw the names of the jurors out of the hat, twelve of the jurors whose names were in said hat and who were on the special venire of this case, were in the jury room considering their verdict in another capital case. All the names in the hat

were drawn out, including those of the twelve jurors above referred to, thus exhausting the venire before said jurors came out. These names were laid aside by the sheriff in the order in which they were drawn. The panel in this case still lacked about four jurors, and the jury above referred to having reached a verdict came into open court. Thereupon the court ordered the sheriff to put the names of said twelve jurors in a hat and to draw therefrom to complete said jury. The defendant objecting thereto the court said he might have his choice either to have said names of said twelve jurors put in the hat and drawn out one at a time or to have the names of said jurors called in the precise order in which they had been drawn out of the hat, when originally called while they were deliberating on the other jury, but defendant declining to indicate any choice, the court ordered said names put into the hat, properly shaken and drawn therefrom as the law directs, and defendant duly excepted to this action of the court and objected to the completion of the jury except by drawing again from the jury box, and excepted to the refusal of the court to so order."

The evidence on the part of the State tended to show that before the finding of this indictment, the defendant, in company with one Bill Jenkins, went to a certain designated place near the city of Montgomery, where said Jenkins together with other persons, engaged in a game of craps; that defendant did not play; that after the game of craps had been in progress for some time, said Jenkins drew a pistol and claimed that he had been robbed of a certain amount of money, declaring at the same time that he was going to have the money back or kill somebody; that the charge was denied by all of the persons engaged in the game; that after repeating the charge Jenkins thereupon ordered all the persons present to stand in line and hold up their hands, and made them all do so, except the defendant, Bill Thomas; that several persons came up and they were immediately required to get in line; that Jenkins then held his pistol on the persons so "lined up," and told the defendant to "go through them;" that

[Thomas v. State.]

the defendant then searched each of the persons in line, while Jenkins still held his pistol on them; that when the defendant reached one Fitzpatrick, who was the person charged in the indictment to have been robbed, he hesitated about giving up his money; that thereupon Jenkins told Fitzpatrick that if he did not give up the money he would kill him; that Fitzpatrick then gave the money to the defendant, who, in turn, handed it over to Jenkins; that all the money obtained by Thomas from searching the persons in line, was turned over by him to Jenkins; that after the search was finished, said Jenkins fired his pistol and went off, and shortly after the defendant followed and overtook Jenkins, and they disappeared together; that afterwards, on the same day, the defendant and Jenkins were seen at or near the house of one Richard Jackson.

The evidence for the defendant tended to show that after said Jenkins had accused the persons who were playing the game of craps of having robbed him, that some of the crowd said to Jenkins, "let your friend search us;" "that Jenkins made him [the defendant] search the persons and do what he did, and that all the money he got was turned over by him to Jenkins;" that the defendant did not go off with said Jenkins, but that he did speak to him later in the day at Jackson's house;" "that the part he [the defendant] took in the affair was at the command of Jenkins while he had the pistol in hand, and that he got none of the money taken." The defendant requested the court to give to the jury the following written charges, and separately excepted to the court's refusal to give each of them as asked: (1.) "If the jury believe the evidence, they must find the defendant not guilty." (2.) "If the jury are satisfied from the evidence that what the defendant did in the alleged robbery he did involuntarily, then the jury must acquit the defendant." (3.) "If the jury are satisfied from the evidence that what the defendant did in the alleged robbery he did from compulsion and fear, that unless he did do what he did, he would be shot, the jury must acquit the defendant."

9c

[Thomas v. State.]

C. P. McIntyre and W. F. Herbert, for appellant, cited 1 Wharton Criminal Law, § 94; 1 Bishop Criminal Law, § 346; McLain on Criminal Law, § 136; 3 Lawson's Criminal Defenses, 633; *Regina v. Crutchley*, 5 C. & P. 133.

Chas. G. Brown, Attorney-General, for the State, cited 10 Amer. & Eng. Ency. of Law, 347, § 2, and notes; *Arp v. State*, 97 Ala. 5; *Murphy v. State*, 108 Ala. 13.

DOWDELL, J.—The jury in this case was organized and impaneled under a special law approved March 2d, 1901, entitled an act "To more effectually secure competent and well qualified jurors in the county of Montgomery."—Acts, 1900-1901, p. 1994. Section 10 of this act, pages 2002-3, contains the following provisions, viz.: "Provided, that if at the time appointed for the trial of the capital case a jury should not be made of those who are summoned and appear, the presiding judge or associate judge, as the case may be, shall draw from the jury box such number of names as he may deem proper to complete said jury, and additional names may be so drawn as often as may be necessary, provided that should any juror so drawn reside more than two miles from the court house, the said juror may in the discretion of the presiding or associate judge be relieved from attendance on said trial: Provided further, * * * * ; and upon the trial of any cause in either of said courts a juror who has been drawn and summoned and is in attendance upon the court and whose name is drawn for the trial of such cause shall be found to be upon a jury which is considering a verdict in another cause, it shall be no objection to proceeding with the trial of the cause in which his name is drawn as a juror, nor for the continuance of such cause, nor shall either party have the right to call such juror from the jury that he may have an opportunity to pass on such juror, but the name of such juror shall be laid aside and the drawing of the jury proceed as in the absence of a juror who is summoned and fails to appear."

It is manifest that the purpose of these provisions in the statute was to prevent delay in the due administra-

[Thomas v. State.]

tion of the law in the trial of capital cases. It is the rule in the impaneling of a jury, when the name of a juror is drawn and such juror fails to appear, to lay aside his name and proceed with the drawing until the jury is completed, or until the list of names is exhausted, and if the list be exhausted before completing the jury, then, in that event, to make the necessary order or orders for talesmen from which to complete the jury. It was not the purpose of the statute to deprive the defendant of the right to pass upon the jurors drawn upon the *special venire* in his case, except in the emergencies named in the statute, and then to avoid delay in the administration of the law, nor to confer on him the right to have additional jurors drawn and summoned, to be substituted for those drawn on his *special venire,* when those, whose names had been drawn and laid aside because engaged in the trial of another cause, had returned into court a verdict and been discharged from such other cause, before an order had been made for drawing and summoning talesmen. To allow such would tend to create rather than prevent delay, and thereby defeat the very purpose of the statute. In the present case, the jurors whose names were drawn and laid aside because engaged at the time in the trial of another cause, came in with a verdict in such case and were relieved from that case, before any order for talesmen was made in the case at bar. There was no delay created by their absence in the discharge of their duties, and therefore no necessity arose for making an order for the drawing and summoning of talesmen to complete the jury. The bill of exceptions recites that the list of names was exhausted before the jury was completed, and that, thereupon, the jury upon which were those jurors, whose names had been drawn and laid aside, came into court with a verdict. Or in other words, immediately upon exhausting the list, these jurors whose names had been drawn and laid aside came in and were ready to answer, in this cause. The court gave to the defendant the option of passing upon these jurors in the order in which their names had been drawn from the hat, or of replacing the names in the hat and again drawing. The defendant declined to do either, but de-

[Thomas v. State.]

manded that the names of additional jurors be drawn and summoned. This the court refused, and directed these names, that is the names of the jurors which had been laid aside, to be put again in the hat, and for the drawing to proceed. From these jurors the jury in the case was completed. It will be observed that the defendant obtained a jury to try his case, from the *special venire* drawn and summoned for his case. This was all that he was entitled to under the law; and the court committed no error in its rulings in this respect.

There was sufficient evidence from which the jury might have reasonably inferred the defendant's complicity in the crime committed by Jenkins. The evidence without dispute shows that he went to the place where the robbery was committed in company with Jenkins, that he left the scene soon after Jenkins left, and was afterwards on the same day seen at the house of one Jackson in company with said Jenkins, though defendant says that he did not go there with him, but did speak to Jenkins on this latter occasion, and that he got none of the spoils of the robbery. He was spoken of and to, at the time of the alleged robbery, as the friend of Jenkins, and was so recognized without any denial on his part of such relationship. The evidence does not show that the defendant in what he did, acted under compulsion from fear of death or serious bodily harm to himself; the most that can be said of it is, that he acted under the request or command of Jenkins. There is not the slightest evidence that he was threatened in any way by Jenkins, with death or great bodily harm, if he, defendant, failed or refused to obey his request or command. Nor was there any objection or remonstrance by the defendant. That the act was done under the command of a superior, furnishes no excuse or justification in a charge for robbery. See 10 Am. & Eng. Ency. Law (2d ed.), page 347, and notes, where the question is discussed and authorities cited. We are not to be understood as intimating in what is said above, that the defendant would have been excusable, if he had acted under duress of life or great bodily harm. The facts in the case do not present this question, but merely that of one acting under the request or com-

[Thomas v. State.]

mand of another. The only threats that were made by Jenkins were directed to those whom he had "lined up," and upon whom he held his pistol, and the defendant was not one of these. The bill of exceptions recites "that it was testified in defendant's behalf that Jenkins made him search the parties and do what he did," and in this connection, it is further shown, that the defendant testifying as a witness in his own behalf swore, "that the part he took in the affair was at the command of Jenkins while he had the pistol in hand, and that he got none of the money taken." There is no pretense of a threat to life or limb by Jenkins towards the defendant, and taking this evidence in connection with the undisputed evidence, showing that the defendant was a friend of Jenkins, there is nothing to authorize the inference that the defendant acted under duress of life or great bodily harm, when he was told by Jenkins to search those whom he, Jenkins, had "lined up" and upon whom he held his pistol.

There was no error in the refusal of the written charges requested by the defendant. Finding no error in the record, the judgment will be affirmed.

TYSON, J., *dissenting.*—It is entirely clear to my mind that the evidence offered an inference for the consideration of the jury that defendant's participation in the robbery was under duress. The circumstances of the transaction, the situation of defendant at the time, the menacing attitude of Jenkins, armed as he was with the means of enforcing his commands, when taken in connection with defendant's statement that he was made to do what he did, unless we abolish the well known rule which has prevailed in this court since its organization that inferences of facts deducible from the evidence must be submitted to the jury, make a case where the existence of the fact of duress *vel non* was not for the ascertainment of the court, but for the jury.

Charge 3 requested by defendant asserted a correct proposition of law (10 Am. & Eng. Ency. Law (2d ed.), pp. 346-7), and as the evidence afforded an inference in support of the truth of the facts hypothesized in it, in my opinion, it should have been given.

SHARPE, J.—I agree with Justice TYSON.